**DSD LABORATORIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

v.

**Science Applications International Corporation, Intervenor.**

**No. 00–177C.**

United States Court of Federal Claims.

April 14, 2000.

Michael J. Gardner, Williams, Mullen, Clark & Dobbins, P.C., Virginia Beach, Virginia, attorney of record for the plaintiff. Thomas O. Mason, Barbara Kinosky, James Phillips, and Francis Purcell, of counsel.

Sean H. Lane, Commercial Litigation Branch, Bryant G. Snee, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, David W. Ogden, Acting Assistant Attorney General, United States Department of Justice, attorneys of record for the defendant. Paul J. Coelus, Lieutenant Colonel, United States Air Force Legal Services Agency, of counsel.

James J. McCullough, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., attorney of record for the intervenor. Catherine E. Pollack, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiff, DSD Laboratories, Inc. (DSD), filed a complaint and request for a temporary restraining order and a motion for preliminary injunction with this court on April 3, 2000, protesting the decision of a United States Air Force contracting officer to exclude DSD from a procurement, based on an alleged organizational conflict of interest (OCI). In addition, the government alleges that the absence of the plaintiff on the General Services Administration (GSA) Federal Supply Schedule (FSS) selected for use in the procurement also makes the plaintiff ineligible to compete for the procurement. The court held an initial hearing on April 4, 2000, and directed the parties to simultaneously brief the pertinent issues identified, including the GSA Schedule issue, which was not raised in the complaint. The agency has

advised the court that it intends to make award in the procurement at issue on April 17, 2000. The parties provided their points and authorities on April 7, 2000, and their response briefs on April 10, 2000. The court held a hearing on the plaintiff's request for injunctive relief on April 11, 2000, and issued a bench decision as well as this decision on April 14, 2000.

By way of background, the government awarded an earlier contract, known as a Contract Advisory and Assistance Services (CAAS) contract, to B3H Corporation in 1996 (the 1996 CAAS contract). Pursuant to the contract, B3H provided consultant services to the Air Combat Command at Langley Air Force Base, Virginia. The 1996 CAAS contract was an indefinite-delivery, indefinite-quantity (IDIQ) contract, with the agency issuing task orders as work was needed. The prime contractor, B3H, in turn, subcontracted work on the CAAS contract to the plaintiff, DSD.

In April 1999, the agency issued a task order (the 1999 task order) under the 1996 CAAS contract for "Establishment of Air Expeditionary Force (AEF) Central Sourcing Team" (the new scheduling organization). The 1999 task order, with a very similar follow-on year 2000 task order, provided for the development of

> all aspects of planning, organizing and establishing the central sourcing team; planning, preparing and implementing AEF personnel sourcing, tasking and accountability guidance, requirements, and systems; ensuring these new procedures and requirements are in compliance with ongoing ACC [Air Combat Command] reengineering efforts; completing required analysis; development of an automated AEF schedule; and provid[ing] follow on support.

B3H subcontracted work under the 1999 and year 2000 task orders to the plaintiff, DSD. The specific tasks under the 1999 task order included, among others, the following:

> 4.3 Design and Assist Central Sourcing Team Stand Up: Based on the central sourcing team's mission, responsibilities, and processes, the contractor shall produce a written plan, which recommends what is

required to organize, establish and man such an organization.... This plan shall include the agency mission statement, specific responsibilities, flow charts and descriptions of the processes necessary to efficiently execute this mission, as described in Para. 4.2, an organizational structure, the expertise (AFSCs [Air Force Specialty Codes] and grades) and manpower required, manpower data to justify new billets, and the automated systems necessary.... Additionally, the contractor shall not only help design and organize this new agency, but shall also follow implementation through at least one full deployment cycle (15 months) and the cross-over to the second cycle in order to trouble shoot and fix process oversights, errors or needed revisions.

The year 2000 task order called for, among other tasks, continuing "to refine the written stand up plan" described above.

In March 2000, the agency issued a solicitation (the year 2000 solicitation). The plaintiff's proposal has been excluded from that competition by the contracting officer. The contracting officer advises that she chose, as the advantageous manner of obtaining the required services, to use a General Services Administration Federal Supply Schedule contract. She selected Schedule 874, entitled "Management, Organization, and Business Improvement Services" as the appropriate schedule. The year 2000 solicitation is designed to obtain contract support for the subject of the task orders, the Expeditionary Combat Support Scheduling Team. As procedurally permitted, the contracting officer sent out three Requests for Quotations to prospective contractors, and did not include DSD in that group. The plaintiff advises that another contractor, Science Applications International Corporation (SAIC), asked if DSD was interested in teaming with SAIC for the year 2000 solicitation. Although DSD had not originally been sent a copy of the solicitation, as a result of the SAIC inquiry to it, the plaintiff requested a copy of the solicitation from the agency. The year 2000 solicitation was sent to DSD by e-mail on March 15, 2000 by someone other than the contracting officer. The agency advises that SAIC

inquired the next day, March 16, 2000, whether DSD and B3H were precluded from working on the year 2000 solicitation by virtue of an OCI stemming from the 1999 task order work.

On March 20, 2000, the agency informed DSD orally by telephone and by e-mail that it could not compete under the year 2000 solicitation because of a conflict of interest. DSD advises that, nevertheless, it submitted its proposal in response to the year 2000 solicitation the next day, on March 21, 2000. On March 30, 2000, DSD met with the agency contracting officer, and was informed that, in addition to the OCI problem, the procurement contemplated placing a task order with a General Services Administration (GSA) Federal Supply Schedule (FSS) contract, using Schedule 874, "Management, Organization, and Business Improvement Services" (MOBIS). The agency explains that GSA has separate contracts with various vendors, and lists those vendors on "schedules" for different goods and services. DSD, in fact, has a GSA contract which is listed on Schedule 70, for "General Purpose Commercial Information Technology Equipment, Software, and Services," but does not have a contract under GSA Schedule 874. DSD, therefore, submitted its proposal in response to the year 2000 solicitation under Schedule 70. As noted above, the contracting officer advises she used GSA Schedule 874 for the year 2000 solicitation.

The prime contract, noted above, between the government and B3H—the 1996 CAAS contract—contained a reference to FAR 9.5, "Organizational Conflict of Interest," and contained a series of clauses which laid out restrictions, including:

3.16.1 *Concurrent/Future Contract Restrictions:* In order that the Government may prevent conflicting roles which might bias the Contractor's judgment or objectivity and afford an unfair competitive advantage to the Contractor, the parties to this contract agree that the Contractor, its parent company, subsidiaries, and affiliates, if any, shall be restricted in its' concurrent or future contracting to the extent described herein.

3.16.1.1 The Contractor shall be required to perform studies that will directly impact future Government requirements. In support of these studies, the Contractor may have access to certain proprietary information and data. The Contractor is precluded from award of any contract or subcontract or from acting as a consultant to other contractors for those programs resulting form the recommendations of these studies. This restriction shall be effective for five (5) years after the completion of the contract. . . .

(Comp Exh. A) The OCI clauses also addressed subcontracting, such as the arrangements between B3H and DSD, with the following language:

3.16.2.3 The Contractor agrees to include the substance of this provision in all subcontracts for this program. The Contracting Officer will consider case by case subcontract exceptions for individual Task Orders in the event that:

3.16.2.3.1 The prime contractor considers the application of the prohibition set forth in this provision to be inappropriate and unnecessary in the case of a particular subcontractor expected to perform a limited, well defined, and non conflicting role on a particular Task Order effort;

3.16.2.3.2 The subcontractor provides a written statement affirming absolute unwillingness to perform absent some relief from the substance of aforesaid paragraphs;

3.16.2.3.3 Use of an alternate subcontract source would unreasonably detract from the quality of effort; and

3.16.2.3.4 The prime contractor provides the Contracting Officer timely written advance notice of these and any other extenuating circumstances.

The OCI language also indicated that the clauses "may be subject to negotiations" with the government, and included tests for "a modified OCI provision," including that the policy must avoid unfair competitive advantage or potential bias, and the nature and duration of the restriction must be reasonable and clear.

The 1999 and year 2000 task orders issued pursuant to the 1996 CAAS contract on

which DSD performed work as a subcontractor to B3H did not contain a reference to OCI clauses. The applicable 1996 CAAS contract clauses specifically incorporated by reference in the task orders were CAAS statement of work clauses 1.4 ("Requirement"), 3.13 ("Management and Professional Support Services"), and 6.4 ("HQ ACC/DP—Directorate of Personnel"). Statement of Work clause 3.16, "Organizational Conflicts of Interest (OCI)," was not cited in the 1999 or year 2000 task orders. The umbrella subcontract between B3H and DSD, however, does contain the following clause:

> 3. FLOW DOWN. Some clauses of the [1996 CAAS] Prime Contract are included hereunder for particular treatment and emphasis, however, all terms and conditions of contract F44650–96–D0003 shall apply to this subcontract agreement. Further, all of the terms and conditions of the FARs, and DFARs shall be used to resolve disputes consistent with this agreement and contract F44650–96–D0003.

The OCI and the GSA Schedule contract issues are discussed below.

## DISCUSSION

The plaintiff has filed a protest to enjoin any award by the Air Force under the year 2000 solicitation, or, if award is made, to enjoin any performance under the contract. The plaintiff further seeks a declaration that it does not possess an OCI, that it is eligible to compete on the GSA Schedule procurement, and direction to the Air Force to consider the proposal that plaintiff has submitted in response to the solicitation.

The 1996 amendments to the Tucker Act provide that the court

> (b)(1) shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.... [T]he United States Court of Federal Claims ... shall have jurisdiction to entertain such an action

without regard to whether suit is instituted before or after the contract is awarded.

> (2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

> \*      \*      \*      \*      \*      \*

> (4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C. § 1491(b)(1)-(4) (1994 & Supp. II 1996). *See Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 n. 5 (Fed.Cir. 1998). Under the scope of review set forth in 5 U.S.C. § 706, agency action is upheld, unless it is determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1300 (Fed.Cir.1999) (citing 5 U.S.C. § 706(2)(A) (1994)); *Ramcor Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999).

Under an arbitrary and capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). So long as the relevant factors were considered and there was a rational basis for the decision, the agency's action will be upheld. The reviewing court

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered

to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975).

To prevail in a bid protest case, the protester also must demonstrate prejudice. *See* 5 U.S.C. § 706(2) (1994) ("due account shall be taken of the rule of prejudicial error"). Expanding on the requirement, the United States Court of Appeals for the Federal Circuit has held that

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration' " (citation omitted)).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (*reh'g denied* ) (alterations in original).

### Organizational Conflict of Interest (OCI)

An OCI is defined as follows:

> [B]ecause of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or

might be otherwise impaired, or a person has an unfair competitive advantage.

48 C.F.R. § 9.501 (1999). "A conflict of interest exists when the contractor's objectivity may be impaired due to the nature of the work to be performed." *Informatics Corp. v. United States,* 40 Fed.Cl. 508, 513 (1998) (quoting *KPMG Peat Marwick,* B–255224, 94–1 CPD ¶ 111). The 1996 CAAS contract, described above, referenced FAR Subpart 9.5, "Organizational Conflict of Interest," and contained a number of OCI clauses. Plaintiff argues that the subsequent 1999 and 2000 task orders subcontracted to DSD by B3H referenced only three clauses from the 1999 CAAS contract, and could have referenced the OCI clauses, but did not. The plaintiff concludes from this omission in the task orders that the OCI provisions do not apply and should not prevent DSD from competing under the procurement at issue before this court. The court disagrees. As noted earlier, the CAAS Subcontract between B3H and DSD contains a flow down clause, which effectively incorporates all provisions in the 1996 CAAS contract, including the OCI clauses, into the subcontract:

> 3. FLOW DOWN. Some clauses of the [1996 CAAS] Prime Contract are included hereunder for particular treatment and emphasis, however, all terms and conditions of contract F44650–96–D0003 [the 1996 CAAS contract] shall apply to this subcontract agreement. Further, all of the terms and conditions of the FARs, and DFARs shall be used to resolve disputes consistent with this agreement and contract F44650–96–D0003.

This flow down is consistent with clause 3.16.2.3 of the 1996 CAAS contract between the government and B3H, which states that "[t]he Contractor [B3H] agrees to include the substance of this [OCI] provision in all subcontracts for this program [such as DSD's subcontract]." The plaintiff's contention that OCI clauses were not contained in the 1999 and year 2000 task orders, and, therefore, the government would have to ignore virtually any conflict of interest, however egregious, ignores the flow down clause quoted verbatim above.

Moreover, even if there were no flow down of OCI clauses, the contracting officer still could act to avoid organizational conflicts of interest. *See* the Federal Circuit's opinion in *NKF Engineering, Inc. v. United States,* 805 F.2d 372 (Fed.Cir.1986). In *NKF,* no violation of the Ethics in Government Act, and particularly of 18 U.S.C. § 208(a), was found, such that all that was left was the appearance of a conflict of interest. *Id.* at 375. The Federal Circuit, nevertheless, held, based on the circumstances of that case, "we cannot say that the agency's conclusion, that there was an appearance of impropriety, was unreasonable or irrational," *id.* at 376, so that "the Claims Court order overturning that [contracting officer's] decision was erroneous and is vacated," *id.* at 378.

Furthermore, the Federal Circuit, approved and extended the following Claims Court language to cases involving the appearance of impropriety:

NKF argues that neither the terms of the solicitation nor any regulation or statute authorize its disqualification "to protect the integrity of the procurement process from the appearance of and the potential for an unfair competitive advantage." The Claims Court responded:

Despite the seeming absence of any authority expressly authorizing the actions that were taken in this case the court is of the view that the contracting officer's responsibility of "safeguarding the interests of the United States in its contractual relationships," 48 C.F.R. § 1.602–2 (1985), is sufficient to support the exercise of authority that was asserted. What persuades us to this view is the latitude the courts have historically shown with respect to the contracting officer's basic authority to enter into, administer, or terminate contracts, and the overriding importance of the Government's need to insure full and fair competition in the conduct of its procurements. A procurement system powerless to rid itself of an unfair competitive advantage gained through inside information would soon lose every vestige of competitiveness. There can be no question, therefore, that the contract-

ing officer had authority to act upon his concerns and, in an appropriate case, to cause the disqualification of a bidder.

Though the Claims Court erroneously limited that power to cases involving actual, but not the appearance of, impropriety, we do not repeat that mistake here.

*NKF Engineering, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986) (citations and footnote omitted). The language of FAR 1.602–2, relied on by the Federal Circuit in 1986, has remained the same. *See* 48 C.F.R. § 1.602–2 (1999). *See also Compliance Corp. v. United States,* 22 Cl.Ct. 193, 199–201 (1990), *aff'd,* 960 F.2d 157 (Fed.Cir.1992) (Table). The court, therefore, concludes that OCI principles apply to the 1999 and year 2000 task orders on which DSD performed services.

The plaintiff also contends that, while it was excluded for OCI reasons, other contractors were not. Plaintiff points to other contractors having access to DSD's work product from the 1999 task order, and complains that "the contracting officer took no action to consider whether such other contractors should be excluded from the competition...." The FAR, however, describes not one but four areas in which OCIs may arise: providing systems engineering and technical direction; preparing specifications or work statements; providing evaluation services; and obtaining access to proprietary information. 48 C.F.R. §§ 9.505–1, 9.505–2, 9.505–3, 9.505–4. The government is not alleging that DSD provided evaluation services or had access to proprietary information, with the potential for gaining an unfair competitive advantage. The basis for the government's assertion of an OCI appears to be more in the first two areas listed above. Defendant contends that:

DSD was a subcontractor on TO 99–27, the purpose of which was to develop all aspects of the planning, organizing and establishing of ESIT, the new organization to deploy Air Force personnel under the new AEF structure. As part of the work under TO 99–27, DSD played a role in making recommendations to the Air Force regarding the composition of the very organization that the RFQ [Request for Quo-

tations] now seeks to fill. As the recommendations made by B3H and DSD formed the basis of the ESIT SOW [statement of work] for the RFQ, the contracting officer had a legitimate concern that DSD might have, intentionally or not, skewed the competition in favor of itself for the RFQ.

\* \* \* \* \* \*

TO 99–27 clearly required contractors performing its requirements to make a detailed recommendation to the agency regarding the composition of the ESIT, including the expertise of the personnel required to do the job. DSD's role in making such recommendations raises the concern that DSD could, intentionally or not, skew the competition in its favor by recommending skills and types of personnel for the ESIT that DSD knew that it already possessed in its company.

(Citations omitted.) DSD's reported accomplishments on the 1999 task order included the following: "Developed outlines of written plan to organize, establish, and man [the new scheduling organization]," "Current position descriptions captured," "Created new position descriptions and updated changes as collected" (DSD report dated May 14, 1999); "Finalized sections of the Transition Plan required to stand up the [the new scheduling organization]," "Refined sections of Transition Plan to organize, establish, and man [the new scheduling organization]," "Facilitated process flow design meetings and manpower staffing meetings," "Current position descriptions finalized and future descriptions drafted" (DSD report dated June 14, 1999); "Finalized sections of the Transition Plan required to stand up the [new scheduling organization]," "Refined sections of Transition Plan to organize, establish, and man [the new scheduling organization]," "Current position descriptions finalized and future descriptions drafted," "Develop written plan to organize, establish, and man [the new scheduling organization]" (completed June 1, 1999); "Create position descriptions" (completed June 1, 1999); "Finalize "to be" interviews with Functionals and develop workload man-years" (planned activity for the next reporting period, after the June 1999 report-

ing period) (DSD report dated July 14, 1999). The task order and the status reports reflect DSD's pervasive impact on the new scheduling organization.

The FAR provides that contractors in a position to favor their own products or capabilities are "prohibited from supplying a system or services acquired on the basis of work statements growing out of their services...." 48 C.F.R. § 9.505–2(b)(2). A contractor determining specifications and work statements "should not be in a position to make decisions favoring its own products or capabilities." 48 C.F.R. § 9.505–1(b). The FAR also provides the example of a contractor preparing a plan for the technical training of government personnel. In the FAR example, the contractor has suggested the curriculum, which is incorporated into a solicitation to conduct the training itself. The FAR example concludes that the contractor has an OCI and may not conduct the training. See 48 C.F.R. § 9.508(g). The OCI rules are designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and provide "unfair competitive advantage." 48 C.F.R. § 9.505(a), (b).

Given the nature of the work performed on the 1999 task order, the contracting officer had a reasonable basis for excluding DSD from the year 2000 solicitation on OCI grounds. Furthermore, the year 2000 task order requires DSD to assist in the stand up of the new organization, to "continue to refine the written stand up plan, which recommends what is required to organize, establish and man such an organization," and to "trouble shoot and fix process oversights, errors or needed revisions." Thus, if DSD were the contractor for the new organization, it could help "stand itself up," help establish its own manning, and trouble shoot itself, under the description of work contained in the 2000 task order.

The plaintiff also argues that two other contractors, SAIC and Synergy, "have a greater competitive advantage [than DSD], yet they were permitted to bid." The plaintiff submitted the affidavit of a System Analyst who led DSD's efforts under the 1999 task order. The affidavit advises that:

SAIC is the prime to the ACC re-engineering effort and was updated during the many iterative steps of our process development. ACC/CVT and, concurrently, SAIC team representatives received briefings, presentations, and documents on our entire process to ensure we fit into their larger ACC re-engineering effort. We were also required to coordinate extensively with the AEF Center and AF/XOP, which has Synergy contractors integrated into their staff. Both agencies are a management level above any government representative overseeing the CAAS contract and have exercised veto power over many of the ACC/XOO–E recommendations. Additionally, a Synergy contractor, Dana Morell, worked in the office for several months while we developed the processes and organization. We readily made all information available to her. None of the work produced under our contract was considered proprietary. As a matter of fact, we made it available to everyone who needed it. Most of the data was posted on shared drives and web pages which are accessible to Synergy, ACS, AB Technologies, MTC and SAIC.

In response, a declaration from SAIC's CAAS program manager advises that SAIC "did not establish or stand up the [new scheduling organization]," "did not receive any information or documents from DSD related to the requirements of the Solicitation," and received only general information about the new scheduling organization pursuant to its supporting role on a government-led reengineering team for Headquarters Air Combat Command organizations. SAIC advised that the communications with and information from DSD related to organizational structure only, and did not address "specific requirements, specific organizational makeup, numbers of personnel required, specialties, or job descriptions"; furthermore, SAIC and its subcontractors did not "participate[ ] in these specific definitions or requirements, nor did they have any influence on those definitions or requirements." Similarly, Synergy's Langley AFB representative advised that Synergy assisted in developing the process for generating deployment orders, but "had no involvement in the effort to organize and

staff the [new scheduling organization]." The Synergy employee mentioned by DSD, Ms. Morell, was apparently detailed to assist in setting up a conference related to the new scheduling organization, with her duties including "conference facility preparations, registration and transportation for attendees, daily refreshments, administrative support, and preparing conference information packages." In contrast to DSD, the record reflects that SAIC and Synergy appear to have provided no support for the organization, establishment, and manning of the new scheduling organization.

The plaintiff further contends that the contracting officer failed to follow the FAR, in "never consider[ing] whether an OCI could be avoided," but still excluding DSD from the bidding process. The FAR requires that contracting officers identify OCIs as early in the acquisition process as possible, and "[a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. § 9.504(a)(1), (2). The contracting officer had not identified a potential OCI at the point that she sent the Request for Quotations to three GSA Schedule 874 contractors, given that DSD did not have Schedule 874 contract. The OCI issue regarding the plaintiff arose subsequently when DSD requested and received a copy of the Request for Quotations from another individual in the procurement office while the contracting officer was out of the office for a week, and when DSD responded by submitting a proposal. The FAR provides that "[b]efore determining to withhold award based on conflict of interest considerations, the contracting officer shall notify the contractor, provide the reasons therefor, and allow the contractor a reasonable opportunity to respond." 48 C.F.R. § 9.504(e). On March 20, 2000, the contracting officer notified DSD of the OCI orally and by e-mail. In her March 20, 2000 e-mail, she offered as the reason for the OCI: "The work we are soliciting for under the instant procurement is a result of the work obtained under the CAAS task order; thus, you are precluded from competing for this work at this time." DSD responded to the OCI issue raised by the contracting officer, both in its proposal on the year 2000 solicita-

tion, dated March 21, 2000 and in a letter dated March 21, 2000. The contracting officer considered and responded to DSD's input on March 23, 2000. DSD's input was not persuasive, since the thrust of the input was that there was no OCI associated with having obtained proprietary information, because all the information was widely available. The contracting officer's response reiterated the alternative basis for the OCI, which had nothing to do with proprietary information:

2. Your support under [the 1996 CAAS contract] remains a valid, valuable requirement for the HQ ACC Directorate of Aerospace Operations. However, the organization we are seeking to create under the subject procurement was established under this CAAS task order. Furthermore, the CAAS task order requires additional, ongoing support to follow implementation of this new organization, not only through initial deployment, but also through a second cycle. A conflict of interest clearly exists if one firm were to perform under both contracts.

The plaintiff argues that it should have been, but has not been afforded an opportunity to propose a mitigation plan, citing *Informatics Corp. v. United States*, 40 Fed.Cl. 508 (1998), and that the contracting officer did not meet her obligations under 48 C.F.R. § 9.504. In *Informatics*, the plaintiff proposed, by letter, several measures to the contracting officer to avoid or mitigate a potential OCI, then two months later submitted an "OCI Disclosure and Avoidance" statement and an "OCI Mitigation Strategy and Plan." *Id.* at 512. The plaintiff's mitigation plan contained concrete suggestions; however, the record contained little evidence that the contracting officer considered the plan. *Id.* at 514–15. The court in *Informatics* determined that the contracting officer's actions were not reasonable under the circumstances. *Id.* at 518. In contrast, DSD has provided no mitigation plan, although it had the opportunity to do so as part of its response to the contracting officer. The government has indicated, however, that mitigation did not seem feasible based on the nature of the OCI. Both under the FAR requirements and under the circumstances of this case in light of the nature of the communications between the contracting officer and DSD in which the contracting officer identified her OCI concerns, it was reasonable for the contracting officer to expect the contractor to take the initiative and propose a specific mitigation plan, if DSD deemed one to be feasible.

The FAR provides that:

(b) If the contracting officer decides that a particular acquisition involves a significant potential organizational conflict of interest, the contracting officer shall, before issuing the solicitation, submit for approval to the chief of the contracting office . . .

(1) A written analysis, including a recommended course of action for avoiding, neutralizing, or mitigating the conflict. . . .

48 C.F.R. § 9.506(b)(1). The chief of the contracting office approves, modifies, or rejects the recommendations of the contracting officer, in writing, and the contracting officer then resolves the OCI consistent with the direction of the chief of the contracting office before awarding the contract. 48 C.F.R. § 9.506(c)(3), (d)(3).

The contracting officer obtained approval of her March 21, 2000 determination of the OCI on March 22, 2000. Her memorandum provides, in part:

4. The work currently being procured under the subject RFQ is a direct result of the efforts acquired under the referenced CAAS task order. Allowing the same contractor that is providing the services to define the [new scheduling organization] to then perform according to those specifics (current RFQ) is a conflict of interest. The CAAS task order includes specific requirements to define processes and timelines, provide recommendations on establishing and manning the organization, including the required manpower and expertise. The task order requires the contractor to "not only help design and organize this new agency, but also follow implementation through at least one full deployment cycle (15 months), and the cross-over to the second cycle, in order to trouble shoot and fix process oversights, errors or needed revisions." This second effort, which is being solicited competitively, will essential-

ly accomplish the work that was developed and proposed under the CAAS effort.

5. The work envisioned under the subject RFQ is a direct result of the efforts obtained under the CAAS task order. Additionally, this new effort will evolve and grow, as new recommendations are developed under the CAAS task order, which is still ongoing. Although B3H Corporation did not "prepare" the statement of work per se, work performed under the CAAS task order provided material that lead directly, predictably and without delay (as it is still ongoing) to this new statement of work.

6. In order to prevent an unfair competitive advantage, as well as to avoid any conflict of interest in the performance of both contracts, the CAAS contractor that was awarded the referenced task order is precluded from furnishing the services sought under the subject solicitation. This restriction applies to B3H Corp., as the prime contractor, as well as any subcontractors [such as DSD] that are also working this task order. . . .

The court agrees that the contracting officer acted reasonably when she concluded that DSD, as a subcontractor to B3H, was precluded by an OCI from competing for the new scheduling organization, stemming from the input it had provided and continued to provide on developing the organization.

*General Services Agency Schedule*

■ The defendant contends that the contracting officer was using GSA Schedule 874 for the year 2000 solicitation, and that DSD does not have a contract with GSA on that schedule. FAR Part 8 addresses procurements made pursuant to Federal Supply Schedules which are managed by the GSA. FAR 8.401 provides that "[i]ndefinite delivery contracts (including requirements contracts) are established with commercial firms to provide supplies and services at stated prices for given periods of time." 48 C.F.R. § 8.401(a) (1999). The GSA schedule contracting office issues Federal Supply Schedules to facilitate placing delivery orders with schedule contractors. 48 C.F.R. § 8.401(b). *See Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 393–94 (1999) (with Federal Supply Schedule procurements, the agency selects "products and services from a list of eligible contractors whose pricing schemes have been pre-approved by GSA.").

The contracting officer in the instant case advised that:

8. In early March 2000, I decided that the most advantageous manner of obtaining the services called for under the ESIT SOW was to place a task order under a General Services Administration ("GSA") Federal Supply Schedule ("FSS") contract. I reviewed the approximately 85 available GSA schedules on GSA's website and determined that the only appropriate schedule for the ESIT services was Schedule 874, entitled "Management, Organization, and Business Improvement Services (MOBIS)."

9. I then scanned the list of contractors on Schedule 874 and selected three names I recognized as having previously performed services on Langley AFB of a sufficiently similar nature to suggest they would be capable of performing the ESIT. . . .

The contracting officer also advised that she e-mailed the three Schedule 874 contractors a Request for Quotations for the year 2000 work at issue, but she did not specify that she was using Schedule 874. The contracting officer was away from her office from Monday, March 13, 2000 to Friday, March 17, 2000. During that time, at DSD's request, the same Request for Quotations materials identifying the procurement as one on a GSA Schedule, but not further identifying the schedule by number, were provided to DSD by other agency personnel in the contracting officer's absence.[1] The plaintiff does not have a contract with the GSA for the services described under GSA Schedule 874, although it appears to have a contract under GSA Schedule 70. When DSD submitted its proposal to the year 2000 solicitation, dated March 21, 2000, it advised that it would "perform all required taskings and

1. It would appear that much of the confusion associated with the year 2000 solicitation could have been alleviated by notice in the Request for Quotations of the GSA Schedule being employed.

reporting required under DSD's GSA Contract No. GS–35F–4905H." Both parties agree that this was a contract placed on Schedule 70.

The plaintiff contends that GSA Schedule 70 (which DSD is on) is the proper schedule for the year 2000 solicitation, and that GSA Schedule 874 is inappropriate for the statement of work in the solicitation. The plaintiff is effectively arguing that the selection of Schedule 874 by the contracting officer for the year 2000 solicitation was arbitrary and capricious. Schedule 70 is entitled "General Purpose Commercial Information Technology Equipment, Software, and Services." A description of the goods and services available under Schedule 70 includes: the leasing, purchase, and maintenance of information technology (IT) equipment; software licensing and software maintenance; classroom training; IT services, including "database planning and design" and "data services"; e-mail services; and telecommunication transmission services. Much of Schedule 70 appears to be inapplicable for the statement of work at issue. At the April 11, 2000 hearing, the defendant suggested that if it were looking for computer systems it would consider using Schedule 70, but that Schedule 70 is inappropriate for the year 2000 solicitation. Plaintiff focuses on the function of data base planning and design and data services mentioned in Schedule 70, then finds these functions in one of the paragraphs of the year 2000 statement of work, and concludes that Schedule 70 is a suitable vehicle to find a contractor for the year 2000 solicitation. In concluding that Schedule 70 is the proper schedule for the statement of work, Plaintiff essentially views the statement of work as calling for IT services. The year 2000 statement of work, however, appears to call for more than data and records management, while the larger thrust of Schedule 70 appears to be computer equipment and software. Perhaps the contracting officer could have selected Schedule 70 for the procurement, but the decision not to use Schedule 70 does not appear to have been arbitrary and capricious, given the thrust of the Schedule 70 and the thrust of the statement of work. Schedule 70 and the statement of work do not appear to be a perfect match.

Plaintiff also argues that Schedule 874 is an inappropriate vehicle for the year 2000 statement of work, in part because of the Schedule's business improvement services orientation. Schedule 874 provides that:

> These contracts cover management, organizational and business improvement services and products (MOBIS) to enable government agencies to improve performance, quality, timeliness and efficiency throughout their organizations.

> These services will facilitate agencies' response to dynamic, evolutionary influences and mandates and will enable them to continuously improve mission performance.

The Schedule's emphasis on improving performance, however, is not an unreasonable focus for a contractor team augmenting and supporting military personnel, particularly in a new organization.

Plaintiff also notes that the "performance of operational activities" is listed in Schedule 874 as an example of services outside of the scope of Schedule 874. The year 2000 Statement of work involves the scheduling of deployment taskings; ensuring the validity of requirements; and planning, analysis and tracking. Schedule 874, however, does provide for consultation and facilitation services. The "operational" aspects of the statement of work suggest that Schedule 874 also may not be a perfect fit for all of the needed statement of work functions. For that matter, the contracting officer has acknowledged that Schedule 874 "was perhaps not a perfect fit for the procurement." The year 2000 solicitation, however, included the statement of work, and provided that a contractor wishing to submit a quotation must also "provide a brief white paper describing your company's approach to accomplish these requirements, along with resumes of key personnel that will be used to support this requirement." To the extent that Schedule 874 is not a "perfect fit," the white paper proposal addressing the statement of work functions would permit the contracting officer to determine if the Schedule 874 contractor could perform the operational activities. The contracting officer's approach to the procurement is not the approach DSD would have taken, and may or

may not have been how the court would have handled the procurement, but it does not appear to be an arbitrary or capricious approach for the contracting officer to have taken. The record does not reflect that Schedule 70 is a perfect fit or the only proper vehicle, nor does it reflect that Schedule 874 is an improper vehicle for the year 2000 solicitation.

The plaintiff notes that it was not until March 30, 2000, that the GSA Schedule 874 issue was raised. Up to that point in time, the government had raised only the OCI issue. To the extent that the plaintiff is suggesting that the procurement had been open to GSA Schedule 70 contracts, or any other GSA schedules up to that point in time, but that the government conjured a GSA Schedule 874 requirement as an additional basis to exclude DSD from the procurement, the record does not support such a thesis. It is uncontested that the contracting officer sent a Request for Quotations to three contractors, all on GSA Schedule 874, and originally did not send it to DSD, which was not on GSA Schedule 874. DSD received its copy of the Request for Quotations from other agency personnel, in the absence of the contracting officer, and only after requesting the Request for Quotations, which, although it omitted the Schedule number, appears to have been designed to be sent only to Schedule 874 contractors. The record does not support a conclusion that a GSA Schedule 874 restriction appeared after the fact to exclude DSD, which did not have a contract on that schedule. *Cf. Dubinsky v. United States,* 43 Fed.Cl. 243, 254–60 (1999) (in *Dubinsky,* ample evidence supported the court's conclusion that the procurement was actually a FAR Part 15 negotiated procurement, rather than a FAR Part 13 simplified acquisition, as contended by the contracting officer), *appeal dismissed,* 1999 WL 681521 (1999) (Table).

The plaintiff also argues that "the Government's position is based on a fiction that the contracting officer first determines what schedule he or she will buy against, and then solicits offers solely against that specific schedule. The opposite is true. . . . [T]he Contracting Officer has an obligation to place

orders with the 'schedule contractor that can provide the supply or service that represents the best value. . . . FAR 8.404(b)(2).' " This FAR language, however, should be read against the guidance in GSA Schedule 874, which provides that: "Agencies placing orders against the MOBIS Federal Supply Schedule are reminded that there is no need to seek further competition beyond the list of schedule contractors, synopsize requirements, or make determinations of fair and reasonable pricing." The language in GSA Schedule 874 suggests that the contracting officer, may, within an acceptable schedule, select the "schedule contractor that can provide the supply or service that represents the best value." 48 C.F.R. 8.404(b)(2).

As an experienced contractor, DSD admits that it was aware that GSA Schedule 70 was not the sole Federal Supply Schedule, and that, in fact, there are numerous other schedules available to the government, which describe varying goods and services. DSD was on notice that the Request for Quotations at issue did not specify a schedule. DSD should have been on notice of the differences between the thrust of its GSA Schedule 70 contract, and the thrust of the statement of work for the year 2000 solicitation, noted above. It is not unreasonable to suggest that DSD had a duty to inquire as to whether the agency was procuring from the single schedule DSD was on, GSA Schedule 70, or from some other schedule. *See Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994) ("If an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer."), *aff'd,* 39 F.3d 1198 (Fed.Cir.1994) (Table); *see also Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963).

Use of Schedule 874 as a procurement vehicle was not unreasonable under the circumstances, and was within the discretion of the contracting officer. The court should not substitute its judgment for that of the contracting officer, but reviews for arbitrary and capricious actions. Once DSD submitted its "initially unsolicited" proposal, however, the issue shifts somewhat, to whether it was

reasonable for the contracting officer to refuse to evaluate DSD's submission, or whether reviewing the proposal would have been in the interest of fostering competition, and in the public interest of trying to seek the most advantageous proposal for the government. The court does not reach this question, since the record supports the contracting officer's refusal to review DSD's proposal for reasons of the organization conflict of interest, discussed above.

*Injunctive Relief*

In order to obtain injunctive relief, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor; and (4) whether a preliminary injunction will be contrary to the public interest.

*ES–KO, Inc. v. United States,* 44 Fed.Cl. 429, 432 (1999) (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993)).

The record does not reflect that plaintiff is likely to succeed on the merits of its complaint, given the OCI. The Federal Circuit in *FMC Corporation* noted that: "Absent a showing that a movant is likely to succeed on the merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown." *FMC Corp. v. United States,* 3 F.3d at 427. The plaintiff argues that it will suffer irreparable harm through the lost opportunity to compete and potential lost profits. However, there is a strong public interest in avoiding organizational conflicts of interest. In addition, the government advises that it intends to award a contract on April 17, 2000, in support of a combat support scheduling organization, which is currently under strength. The personnel strength of the organization impacts its scheduling capability for military contingency operations. There is a strong public interest in proceeding with the year 2000 solicitation in support of contingency operations crises management.

## CONCLUSION

For the foregoing reasons, the plaintiff's request for a temporary restraining order and motion for a preliminary injunction are, hereby, **DENIED.**

**IT IS SO ORDERED.**