LABAT–ANDERSON INC., Plaintiff,

v.

THE UNITED STATES, Defendant,

and

JHM Research And Development
Inc., Intervenor.

No. 01–350C.

United States Court of Federal Claims.

July 27, 2001.

Janet Pitterle Holt, Washington, D.C., for plaintiff.

Michael M. Duclos, with whom were Acting Assistant Attorney General Stuart E. Schiffer, David M. Cohen, and Todd M. Hughes, Washington, D.C., for defendant.

Rand L. Allen, Washington, D.C., for intervenor. Peter M. Kilcullen, Washington, D.C., of counsel.

## OPINION

WILSON, Judge.

This matter is before the Court on Labat–Anderson, Inc.'s (LABAT's) motion for a preliminary injunction, pursuant to RCFC 65, following the issuance of a ten-day temporary restraining order, which was extended for five days to June 30, 2001. Also before the court is intervenor JHM Research and Development's (JHM's) motion to dismiss for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1), or in the alternative, for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). For the reasons discussed below, both intervenor's motion to dismiss and plaintiff's motion for a preliminary injunction are denied.

## FINDINGS OF FACT

The Immigration and Naturalization Service of the U.S. Department of Justice (INS) operates four Service Centers in California, Nebraska, Texas, and Vermont to process the applications and petitions of aliens seeking benefits under federal immigration and nationality laws. Under the Direct Mail Program initiated in 1986, personnel at these Service Centers process approximately five million applications and petitions each year. (Administrative Record (AR) at 6211; Def.'s Answer at 2.) For the past five and a half years, LABAT has performed records management and other operations support services at these Service Centers on a "time and materials" basis. LABAT employs approximately 1,500 employees on the contract, which is the primary contract around which its business is built (TRO Hearing Transcript (Tr.) at 8). The Service Centers' task areas include: mailroom operations, file assembly, data collection, document preparation, fee collection and processing, fileroom operation, quality control, word processing, project management, and business processing reengineering. (AR at 6211–12.)

This post-award bid protest challenges the award of Blanket Purchase Agreement No. COW–1–A–1027 (BPA) to provide records management and forms processing services at the four INS Service Centers. On June 26, 2000, the INS announced in Request for Quotations No. HQ–0–Q–0044 (RFQ) that it planned to award the fixed-price BPA to a single contractor holding a Federal Supply Schedule (FSS) contract under the General Service Administration's Document Management Services and Products Schedule, Special Item Number (SIN) 51–504, "Records Management Services," and other applicable SINs. (AR at 265.) The RFQ estimated that the volume of purchases under the BPA would be $344 million over 60 months. The RFQ further indicated that the BPA would be awarded to the proposal presenting the best value to the government, which would be evaluated in terms of technical approach, past performance, and discounted prices. (AR at 265, 266.)

Although the FSS program enables agencies to adopt a simplified and more flexible approach to the procurement of services on a recurring basis, the source selection process and criteria described in the RFQ contained several procedures and structures more typical of a negotiated procurement. For example, the RFQ provided that price proposals would be analyzed in accordance with techniques referenced in 48 C.F.R. § 15.404 (AR at 287), technical proposals would be rated in accordance with criteria defined by 48 C.F.R. § 15.301 (AR at 837), and debriefing would be conducted pursuant to 48 C.F.R. §§ 15.505–15.506 (AR at 836).

For purposes of this case, the most significant requirement of the RFQ was that each offeror submit two "estimating models" that formed the bases of its price and technical

proposals. In addition to serving as tools to assess an offeror's ability to provide the required services with an appropriately sized work force, the INS planned to use the estimating models as management aids in the administration of the BPA's performance.

The RFQ required an offeror's technical estimating model to contain the offeror's projected staffing requirements for the forecasted workload and to include the underlying assumptions and constraints of the offeror's method for accomplishing the work, the statistical basis for its estimates, and the means by which an offeror derived its technical approach. (AR at 1526–27.) To enable the INS to evaluate proposed prices, the solicitation required that an offeror's price proposal include an explanation of the proposal's pricing, electronic pricing tables based on INS estimates of forecasted demand, and a priced estimating model that contained links to the pricing tables and illustrated how the proposed price had been determined. The INS established a technical evaluation committee (TEC) to evaluate the technical proposals and a business evaluation committee (BEC) to evaluate the price proposals. (AR at 6209–10.)

In rating the proposals, the technical approach and past performance factors combined were to be more heavily weighted than the proposal's price factor. As the Source Selection Award Council's (SSAC) Report stated, "the Government is more concerned with obtaining superior technical performance than lowest overall price." (AR at 6210–11.)

Four offerors submitted "final" proposals to the INS by the original closing date of August 7, 2000: LABAT, JHM, and two other offerors eventually eliminated from the competition. (AR at 1346.) LABAT's initial final proposal scored higher than JHM for technical approach, management, and past performance. (AR at 1509.)

On October 19, 2001, the SSAC determined that it needed additional information from LABAT and JHM prior to the final award decision. (AR at 6216.) Consequently, the INS revised its procurement and issued Amendment No. 6 on October 26, 2001. Amendment No. 6 added language to the

RFQ requiring the electronic versions of the estimating models to contain all formulae and links between spreadsheets and tables contained in the offerors' proposals. (AR at 803.) If a final proposal revision failed to link all spreadsheets and tables, offerors were required to fully explain the rationale underlying all such "hard-coded" entries. A hard-coded entry is a value in a spreadsheet that, when opened or highlighted, does not display a link to another cell or a mathematical formula showing how the value in the cell was calculated. (AR at 803.) Amendment No. 6 expressly provided that the INS would eliminate a proposal that failed to adequately explain its hard-coded entries:

> If an Offeror fails to provide an electronic version of the proposal that contains all of the formulae and links between the spreadsheets and tables presented in its proposal, or provides an estimating model that contains hard coded entries without any rationale for or explanation of the hard coded entries, the BEC will determine the Offeror's proposal to be ***non-compliant*** with the RFP instructions and recommend to the Contracting Officer that the Offeror's proposal be ***eliminated*** from further consideration in the evaluation.

(AR at 803 (emphasis in original).) The amendment's purpose was to enable the BEC and TEC to trace the assumptions and constraints underlying the estimating models' statistical methodology and conclusions and to decipher how prices in each proposal were derived. Final proposal revisions were due by November 2, 2000, or one week after the INS issued its new clarifications and instructions.

In the last round of evaluations, the BEC found LABAT's final proposal revision to be noncompliant with Amendment No. 6. (AR at 1357.) The BEC's noncompliance determination was based on LABAT's failure to clearly explain its rationale for four categories of hard-coded entries: 1) the hours column used to calculate the administrative overhead weighted rate; 2) the allocation percentages of administrative overhead by task area; 3) the allocation of data entry hours and data entry overhead between the data entry and fee collections task areas;

and 4) adjustments made to the historical data provided with the RFQ. (AR at 1353.) According to the BEC, LABAT did not provide supporting information to explain the basis for its staffing estimates, and its inclusion of inadequately explained hard-coded entries in its estimating model prevented the BEC from assessing the proposal's realism. (AR at 1358.) The BEC recommended that the INS eliminate LABAT from further consideration for award based on its failure to comply with the amended RFQ and recommended that the INS award the BPA to JHM, whose price proposal the BEC concluded was reasonable and realistic. (AR at 1358.)

The TEC also considered LABAT's estimating model deficient because it did not meet the RFQ's minimum requirements. (AR at 1555.) The TEC cited multiple flaws in LABAT's final technical approach, including LABAT's failure to provide an estimating model that described the discrete labor in each major process for each form type and task area; failure to propose labor hours per form for two form types at one Service Center; failure to use the INS-provided workload estimates for the mailroom task area; failure to use the RFQ quantities for certain Service Center combinations; and failure to use RFQ quantities for fee-bearing forms by Service Center at any center. (AR at 1563–65.) Based on these flaws, the TEC determined that LABAT's estimating model had two weaknesses and one deficiency. (AR at 1555.) The TEC rated JHM's technical approach "acceptable" and LABAT's technical approach "marginal;" both offerors' past performance records received ratings of "good." (AR at 6219.)

The SSAC determined that the BEC and TEC evaluations fairly represented the merits of each proposal and unanimously accepted the committees' evaluation results. (AR at 6220.) Despite the BEC recommendation that LABAT be eliminated from consideration for award, the SSAC continued with the evaluation process and conducted a best-value analysis for the limited purpose of determining whether JHM's proposal offered value. (AR at 6221–22.) In the best-value analysis, the technical and past performance ratings were combined, yielding an overall rating of "good" for JHM and "marginal" for LABAT. (AR at 6219.) As stated in the RFQ, the Technical and Past Performance categories were equally important and, when combined, were significantly more important than price. (AR at 6222.) Although JHM's proposal was $8,647,073 higher than LABAT's, the SSAC determined that JHM's proposal was technically superior to LABAT's and presented no major risks. The SSAC recommended award to JHM, and the Source Selection Authority (SSA) concurred. (AR at 1666.)

The INS awarded the BPA to JHM on January 3, 2001. Following a post-award debriefing, LABAT filed a protest before the General Accounting Office (GAO) on January 12, 2001, which was subsequently denied on April 16, 2001. See Labat–Anderson, Inc., B–287081, 2001 WL 410356 (Comp.Gen. April 16, 2001). LABAT filed a motion for reconsideration with the GAO on April 26, 2001 but was informed by the GAO that a decision on the motion for reconsideration would not be forthcoming until August. In mid-May 2001, the government informed LABAT that the contract extension due to expire June 30, 2001 would be terminated on June 17, 2001. On June 1, 2001, LABAT filed notice of its intention to file a post-award bid protest in this Court, thereby nullifying its motion for reconsideration before the GAO. (JHM's Answer at 2.) LABAT filed a post-award bid protest action in this Court on June 11, 2001. Following a hearing on the application for a temporary restraining order, the Court entered a temporary restraining order for ten days, which was extended during the pendency of the preliminary injunction hearing for an additional five days. The INS filed the administrative record on June 19, 2001, and the Court granted in part and denied in part plaintiff's motion to supplement the administrative record on June 22, 2001.

## CONCLUSIONS OF LAW

### Subject Matter Jurisdiction

Subject matter jurisdiction is a threshold matter which must be addressed before the court reaches the merits of LABAT's motion for a preliminary injunction. See Steel Co. v.

*Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case."). This Court is a court of limited jurisdiction. *See Kanemoto v. Reno,* 41 F.3d 641, 644 (Fed. Cir.1994) (Congress created a forum where private parties could sue the government for money claims, other than those sounding in tort, where the claims would otherwise be barred by sovereign immunity). Whether this court has jurisdiction depends upon the extent to which the United States has waived its sovereign immunity. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (citing *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)).

In 1996 Congress amended the Tucker Act to grant the U.S. Court of Federal Claims jurisdiction to entertain post-award bid protest actions. *See* 28 U.S.C. § 1491(b) (Supp. II 1996). Specifically, § 1491(b)(1) provides that the U.S. Court of Federal Claims:

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

The amendment also incorporates the standard of review applicable to Administrative Procedure Act cases. 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Pursuant to this standard, the Court can hold unlawful, and set aside, an agency action which is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(A) (1994).

Intervenor JHM's jurisdictional challenge is two-pronged. First, JHM contends that LABAT's protest of the BPA award at issue falls outside the scope of the Tucker Act, because it is neither related to "a proposed contract or to a proposed award of a con-

tract" nor related to any "alleged violation of statute or regulation in connection with a procurement." Second, JHM claims that the Federal Acquisition Streamlining Act of 1994 (FASA), 41 U.S.C. § 253j(d), which prohibits protests "in connection with the issuance or proposed issuance of a task or delivery order" except under circumstances not relevant here, bars the protest of the BPA award at issue in this case. The Court rejects both of these arguments.

The Request for Quotations issued by the INS on June 23, 2000 states that the INS intended to award a Blanket Purchase Agreement against the awardee's GSA FSS contract. (AR at 252, 265.) Federal Acquisition Regulation (FAR) 8.404(b)(4) authorizes the government to use Blanket Purchase Agreements to establish accounts with contractors holding Federal Supply Schedule contracts to fulfill recurring requirements. 48 C.F.R. § 8.404(b)(4) (2000). The FSS program "provides Federal agencies with a simplified process for obtaining commonly used commercial supplies and services at prices associated with volume buying." 48 C.F.R. § 8.401(a). Under the program, an agency may select products and services from a list of eligible contractors whose pricing schemes have been pre-approved by GSA. An agency procuring goods or services pursuant to an FSS contract need not comply with the more formal and rigorous procedures for negotiated procurements set forth in FAR Part 15. Because the "GSA has already determined the prices of items under [the FSS program] to be fair and reasonable," agencies "need not seek further competition, synopsize the requirement, make a separate determination of fair and reasonable pricing, or consider small business programs." 48 C.F.R. § 8.404(a).

██ For the purpose of awarding this BPA, the INS chose to conduct a competitive source selection process aimed at selecting a single offeror already holding a GSA FSS contract. The INS adopted many of the procedures specified in FAR Part 15 for negotiated procurements, including: 1) price analysis techniques prescribed by FAR § 15.404; 2) post-award debriefing prescribed by FAR § 15.506; and 3) technical

evaluation definitions prescribed by FAR § 15.001 (formerly codified at 48 C.F.R. § 15.301 (1999)). While this Court has held that FSS acquisitions are not transformed into negotiated procurements simply because an agency chooses to utilize in its evaluation process more formal elements typically used in a negotiated procurement, where an agency engages in a more comprehensive selection process than contemplated by the FSS scheme, a frustrated bidder may still challenge the agency award under the arbitrary and capricious standard articulated in 5 U.S.C. § 706(2)(A). *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 395–96 (1999).

■ JHM's argument that LABAT's complaint does not allege a violation of a statute or regulation in connection with a procurement is unpersuasive. The Tucker Act's grant of jurisdiction over an alleged "violation of a statute or regulation in connection with a procurement or a proposed procurement is sweeping in scope." *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999). That FAR Part 8 does not contain procedural or substantive standards equivalent to those provided by the FAR for more structured negotiated procurements is inconsequential. As the Federal Circuit explained in *RAMCOR,* the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b)(1), explicitly imports the Administrative Procedure Act (APA) standards of review into the Court of Federal Claims' review of agency decisions. *RAMCOR,* 185 F.3d at 1290. Section 1491(b)(4) thus provides the substantive requirements that a statute or regulation connected to procurement-such as the authorization in FAR Part 8 to enter into Blanket Purchase Agreements-may lack. Just as an agency may "violate" the agency override provision at issue in *RAMCOR* "by issuing a written finding that does not meet the substantive review criteria of 1491(b)(4)," an agency may "violate" FAR 8.404(b)(4) by acting arbitrarily and capriciously when entering into a BPA.

■ The Court also rejects JHM's argument that the alleged violation was not "in connection with a procurement," because a BPA is not a contract. Although the Tucker Act does not define "procurement," as used in 28 U.S.C. § 1491(b), Congress has defined the term broadly in 41 U.S.C. § 403(2) (1994) and 41 U.S.C. § 2302(3)(A) (1994): "The term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." The award of the BPA to JHM is one of the "stages" in the process of acquiring records management and forms processing services that occurred after the INS "determined a need for ... services," the point at which the procurement process begins under the statutory definition. Thus, LABAT's objection to the reasonableness of the INS's award of a BPA against an FSS contract pursuant to FAR Subpart 8 falls squarely within the jurisdictional ambit of § 1491(b)(1).

■ The Court is similarly not convinced that the Federal Acquisition Streamlining Act of 1994's (FASA's) prohibition against protests in connection with the issuance or proposed issuance of a task or delivery order applies to the BPA awarded by the INS to JHM. Section 253j(d) of the FASA states:

> A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued.

While the plain language of the statutory provision clearly bars task order protests, the critical point here is that the award at issue in this case constitutes far more than the mere issuance of a task order against an already-existing GSA FSS or multiple-award contract. Because LABAT is challenging the award of a FAR Part 8 BPA and not the issuance of a task order under FAR Part 16, JHM's argument that the FASA task order protest exemption, 41 U.S.C. § 253j(d), strips the Court of jurisdiction in this case is rejected.

JHM analogizes the award of the Blanket Purchase Agreement to the establishment of a charge account. The award at issue can be more accurately characterized as an agency

decision about which one of several charge accounts to select. As the RFQ explains, the INS intended to acquire Service Center operations support services "by awarding a competitive Blanket Purchase Agreement to a **single offeror**-who has a current [FSS]contract with the GSA...." (AR at 265) (emphasis in original). While it is undisputed that the issuance of task orders against the account and not the establishment of the account itself obligates funds, the decision being challenged is the selection of JHM instead of LABAT as the single "account" against which orders for INS Service Center Operations Support will be issued in the future. The language of the RFQ makes clear that the BPA is not a task order itself, but rather a vehicle against which task orders will be placed. (AR at 260) ("each task order placed under this BPA will include ...."), 874 ("That offeror affording INS the best value as determined by the source selection criteria in the solicitation will be awarded a Blanket Purchase Agreement under which orders may be issued.") Therefore, § 253j(d), by its terms, does not apply here.

In LABAT's first protest of the INS award, the GAO primarily relied on the FASA's legislative history, as explicated in *Severn Cos., Inc.*, B–275717, 97–1 CPD ¶ 181, at 2 n. 1, 1997 WL 270342 (Comp. Gen. Apr. 28, 1997), to refute JHM's argument that the FASA's task order protest bar applies to this procurement challenge. As the GAO noted in *Severn*, there is "no evidence that [253j(d) ] is intended to preclude protests with respect to the placement of orders against GSA FSS contracts." *Id.* Relying on the suggestion in the FASA's legislative history that the FASA was intended to encourage the use of multiple-award contracts, rather than single-award order contracts, the GAO in *Severn* reasoned that no such incentive was required with respect to the FSS, since it already afforded users a choice of multiple contractors. *Id.* at 2 n. 1 (citing H.R. Conf. Rep. No. 103–712, at 178 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2607, 2608; S.Rep. No. 103–258, at 15–16 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2575–76).

In establishing jurisdiction, the Court does not rely on the FASA's legislative history because it does not shed meaningful light on the scope of the task order protest bar. However, the language and regulatory history of FAR Part 16 support the interpretation that the task order restriction was not intended to apply to FSS procurements. Tracking in part the language of the FASA, section 16.500(c) of the FAR states:

> Nothing in this subpart restricts the authority of the General Service Administration (GSA) to enter into schedule, multiple award, or task or delivery order contracts under any other provision of law. Therefore, GSA regulations and the coverage for the Federal Supply Schedule program in Subpart 8.4 and Part 38 take precedence over this Subpart [16.5].

The regulatory comments accompanying the Final Rule codified at 48 C.F.R. § 16 further explain that "[c]ontracts subject to Part 38 were exempted from coverage because [FASA] specifically exempted GSA's Federal Supply Schedule Schedule Program." 61 Fed. Reg. 39,201, 39,202 (July 26, 1996).

In sum, the procurement at issue in this case is not exempt from protest under the FASA, 41 U.S.C. § 253j(d), and may be reviewed for reasonableness pursuant to the Tucker Act. 28 U.S.C. § 1491(b)(1).

*Preliminary Injunction*

■ The Court balances four factors in determining whether to issue a preliminary injunction: the likelihood of success on the merits; whether plaintiff will suffer irreparable injury absent the injunction; the balance of harm to plaintiff and defendant; and the public interest. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993). To succeed on the merits of a bid protest action, a plaintiff must demonstrate that an agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *see* 28 U.S.C. § 1491(b) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). An agency action is "arbitrary, capricious, or an abuse of discretion" only if the award decision "had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed.Cir.2001).

When applying this standard, "[c]ourts must give great deference to agency procurement decisions and will not lightly overturn them." *Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. 388, 392 (1999) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). "Courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa*, 238 F.3d at 1332. Accordingly, the Court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *DSD Labs., Inc. v. United States*, 46 Fed.Cl. 467, 471 (2000). A disappointed bidder bears the "heavy burden," *Impresa*, 238 F.3d at 1333; *E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir.1996), of proving the arbitrary and capricious nature of the agency's decision by a preponderance of the evidence. *Ellsworth*, 45 Fed.Cl. at 392.

■ Based on the administrative record, and oral arguments on the motion for a preliminary injunction, the Court concludes that plaintiff has not demonstrated a likelihood of success on the merits of its claim that the INS award to JHM was unreasonable. Central to the Court's review is the agency's elimination of LABAT's proposal based on its finding that LABAT did not comply with the RFQ by failing to provide a clear rationale for hard-coded entries in its priced estimating model. Amendment No. 6 explicitly states that "[i]f an Offeror ... provides an estimating model that contains hard coded entries without any rationale for or explanation of the hard coded entries, the BEC will determine the Offeror's proposal to be non-compliant with the RFP instructions and recommend to the Contracting Officer that the Offeror's proposal be eliminated from further consideration in the evaluation." (AR at 803.)

The purpose of the amendment was to enable the INS to evaluate the realism and reasonableness of an offeror's price proposal and its reliability as a pricing tool. As the GAO noted in *Labat*, while the realism of offerors' proposed prices is not ordinarily considered in the context of a fixed-price BPA because the contractor bears the risk of unreasonable cost estimates under such a vehicle, 48 C.F.R. § 15.404–1(d)(3) (authorizing use of cost realism analyses in fixed-price contracts in exceptional cases), the nature and extent of an agency's price realism analysis are matters within the agency's discretion. *Hydraulics Int'l Inc.*, B–284684, 2000 WL 1371001, at *11 (Comp.Gen. May 24, 2000). LABAT did not challenge Amendment No. 6 at the time it was issued; it argues in this bid protest only that the agency's application of the amendment and the other requirements of the solicitation were unreasonable. The Court is not empowered to reevaluate the utility of the estimating model criteria imposed by the agency; its duty is to ensure that the RFQ requirements were rationally applied. *See Citizens to Preserve Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Technical & Admin. Servs. Corp.*, B–279828, 1998 WL 681275, at *2 (Comp.Gen. July 24, 1998) ("[T]he determination of the relative desirability and technical adequacy of proposals is primarily a matter of agency discretion, which we will not disturb unless it is shown to be without a reasonable basis or inconsistent with the stated evaluation criteria."), *cited with approval in Cube Corp. v. United States*, 46 Fed.Cl. 368, 386 (2000).

*BEC Evaluation*

The BEC identified as problematic four categories of hard-coded entries contained in the estimating model: 1) the hours column in the worksheet calculation of the administrative overhead weighted rate; 2) the allocation of administrative overhead to each of the task areas; 3) the allocation of data entry hours and data entry overhead between the data entry and fee collection task areas; and 4) adjustments to the INS-provided 1999 workload data. (AR at 1353.)

The BEC's evaluation of each of its four concerns sounds a common theme of unstated methodology. Thus far, LABAT has not succeeded in presenting record evidence or arguments that fundamentally undermine the reasonableness of the INS's conclusion that LABAT failed to adequately explain the rationale for its hard-coded entries as required

by the RFQ and that this failure prevented the agency from evaluating the reasonableness and realism of LABAT's price proposal. In light of the BEC's responsibility to validate the offerors' priced estimating models, the agency's interest in tracing the statistical, formulaic, and other means by which offerors calculated proposed prices is well-founded. LABAT's claims that its price was consistent with the Independent Government Cost Estimate and that its total price was lower than JHM's are not adequate substitutes for the application of the agency's criteria and do not obviate the need to comply with the requirements of the RFQ.

LABAT has drawn the Court's attention to one inconsistency in the BEC's position that the number of inadequately explained hard-coded entries rendered LABAT's proposal noncompliant with Amendment No. 6. An attachment to the BEC's Final Report discussing LABAT's resolution of the INS's deficiencies and clarifications issued on October 25, 2000 states that "upon review of the estimating model the BEC team discovered that a few numbers were still hard entered ... Labat provided an explanation for the hard coded numbers." (AR at 1366.) Although this statement contradicts the BEC's final conclusion, the precise timing of the evaluation is unclear, and it does not address the adequacy of LABAT's explanation for the hard-coded entries. Although the evidence may merit further examination, at this stage it does not alter the balance on the likelihood of success on the merits.

*Administrative Overhead Weighted Labor Rate*

In order to calculate its proposed "administrative overhead" weighted labor rate, LABAT allocated, by percentage, the total number of administrative overhead hours among the various indirect labor functions. All of these allocation percentages were hard-coded entries explained as "values programmed into the model based on management knowledge of each site." (AR at 1931.)

In addition to dissatisfaction with the rationale for the hard-coded entries, the BEC concluded that discrepancies between LABAT's allocation of administrative overhead and historical workload data raised questions about its approach to allocating administrative overhead and raised the specter of a reduced level of service in some components. LABAT claims that the weighted labor rate worksheets were not submitted for the purpose of showing the proportion of hours proposed for each of the components. However, this argument does not address the agency's concern that the inadequately explained hard-coded entries prevented the BEC from validating the model, assessing its usefulness as a management tool, and evaluating price reasonableness and realism. Moreover, although LABAT claims that the historical allocation does not materially differ from its allocations, the chart provided by LABAT reveals some significant disparities. (Pl.'s Suppl. Br. Prel. Inj. at 15.)

*Allocation of Administrative Overhead and Task Areas*

The agency's concern with the hard-coded entries contained in LABAT's allocation of administrative overhead to various task areas also appears reasonable. As illustrated at the preliminary injunction hearing, the relevant spreadsheets contained entries carried out to more than ten decimal places, leading the BEC to believe that LABAT had excluded the formulae used to calculate these percentages. Again, in light of the BEC's duty to validate the priced estimating model, and the express requirements of Amendment No. 6 to explain the rationale for hard-coded entries, the agency's conclusion that LABAT's proposal was noncompliant appears at this stage to be reasonable.

*Allocation of Data Entry Hours and Data Entry Overhead*

It is undisputed that, with the exception of one area (deposits), the RFQ's historical data did not differentiate fee processing and data entry activity, because fee collection hours historically had been combined with other activities in the data entry task area. In order to fulfill the RFQ's requirement that offerors propose workload quantities for fee processing as a separate task area, LABAT conducted a time-based study of fee processing at the California Service Center. (Pl.'s Suppl. Br. Prel. Inj. at 21.) In addition to providing the rationale of management estimates for its hard-coded entries on the rele-

vant worksheets, LABAT provided a figure setting forth its method for allocating the fee processing hours for the California Service Center. Although the BEC was evidently satisfied with the California Service Center number, it criticized LABAT's proposal for not explaining its data methodology for the other three Service Centers, or for its time-based study. The Court cannot find that the INS acted irrationally when it concluded that LABAT failed to adequately explain these hard-coded entries given that LABAT did not provide the study's methodology and included the results of the study for only one Service Center.

LABAT argues that the INS treated the two offerors' fee processing proposals inconsistently by irrationally concluding that JHM's, but not LABAT's, fee processing proposal met the minimum requirements of the RFQ. Originally, in its draft evaluation, the TEC found that JHM's initial proposed fee collection process would be incapable of meeting the RFQ's twenty-four hour turnaround requirement, and consequently considered it a significant weakness. (AR at 8498.) JHM's revised proposal listed five changes to its fee processing proposal, including a plan to "place the bulk of the staff on the first shift, thereby allowing for facility space to be available for the second shift overtime support for workload surges." (AR at 1540.) After comparing JHM's proposal to the historical data, the TEC also found that JHM "had programmed a sufficient number of hours to perform all the fee collection processes." (AR at 1542.) As a result, the TEC removed JHM's significant weakness. (AR at 1539, 1542.) Although some aspects of JHM's reforms to its fee processing proposal are described in overly general terms (e.g., expressing a "clear commitment to do whatever it takes to meet the requirement") (AR at 1540), the Court does not find that, taken together, the changes led to an irrational conclusion that the weakness was corrected.

*Adjustments Made to the Historical Data*

Although LABAT was not precluded by the RFQ from using historical workload data for 28 months rather than the 1999 workload data provided by the INS, the BEC concluded that "[LABAT] did not provide or identify how the assumptions, constraints, efficiencies, facility, and many other planning scenarios affected/changed the RFQ provided historical data." (AR at 1357.) Ascertaining the propriety of adjustments made by LABAT to the underlying historical data fell within the BEC's authority to determine the validity of the estimating model. (AR at 1346–48.) As the case has been developed thus far, the Court cannot conclude that the INS acted irrationally in recommending LABAT's elimination for failing to adequately explain these deviations.

*Technical Evaluation*

LABAT's technical approach received a "marginal" rating on the basis of the agency's assessment that its proposal had one deficiency and two weaknesses. All three of these problems arose in the final proposal stage, and all three implicated the validity of LABAT's estimating model. Although LABAT has highlighted some computational errors made by the INS and argues persuasively that some of the omissions in its proposal were insignificant, its arguments fall short of demonstrating a likelihood of success on its claim that the agency's technical evaluation overall was unreasonable.

The INS assessed a deficiency based on LABAT's failure "to provide a model that describes the discrete labor in each major process . . . for each form type and task area." (AR at 1564.) The RFQ incorporates the FAR's definition of a deficiency as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an acceptable level." 48 C.F.R. § 15.001. (AR at 837, 991.) The two major aspects of the deficiency relate to LABAT's failure to adequately explain the bases for adjustments made to the INS-supplied workload data to derive components of its technical estimating model. First, the INS found that LABAT understated the quantity of mail processed in the mailroom task area at every Service Center by more than seven

million pieces of mail[1] in the base year, thereby significantly underestimating the required mailroom staffing (AR at 1567).

LABAT's technical proposal was based on a 28–month sample of workload data rather than the 1999 data supplied by the INS. In addition, in order to maximize efficiency, LABAT's model transferred certain mailroom transactions to the fileroom. LABAT contends that the INS erroneously ignored the transfer, and that the agency's concern about a staffing shortfall was irrational in light of the higher number of employees incorporated into LABAT's proposal compared to JHM's proposal.

A review of the record reveals that the flaw in LABAT's proposal was not that it relied on a sample of data derived from a longer time span, but rather that LABAT failed to explain the methodology used to transfer work from the mailroom to the fileroom in a manner that would enable the TEC to ascertain the basis for the difference in mail volume and staffing requirements. LABAT claims that the INS applied a "stealth" criteria-using only 1999 data-in evaluating proposals. As with the priced estimating model, the problem was one of methodological transparency rather than the application of unstated criteria. As the GAO noted, "Labat's proposal was not downgraded because it did not use the RFQ estimates *per se* but because it did not provide a sufficient connection between the RFQ's estimates and its own." *Labat–Anderson, Inc.*, B–287081, 2001 WL 410356, at *14 (Comp.Gen. April 16, 2001).

Similarly, the basis for the TEC's concern with LABAT's proposed quantities of fee bearing forms was not that the agency prohibited the use of anything other than 1999 data. Rather, LABAT's utilization of multiple-year data caused it to underestimate the number of employees required to process these forms. (AR at 1565.) The INS was unable to trace the reason for the discrepancies between LABAT's estimates and the 1999 RFQ-provided quantities. LABAT argues that the agency should have been satisfied with LABAT's staffing projections, because the number of employees proposed by LABAT for fee processing allegedly exceeded the number proposed by JHM. This argument overlooks the fact that the TEC was responsible for validating the estimating model and not merely comparing the overall number of employees. In addition, as JHM points out, the number of JHM employees that LABAT uses to compare with its own figure only covered one aspect of fee processing, that is, deposits, and thus does not constitute a fair basis for comparison.

In addition to one deficiency, the TEC identified two weaknesses in LABAT's proposal: 1) inconsistencies between the estimating model and the technical approach, and 2) the absence of methods and rationale used to allocate indirect labor requirements. The RFQ incorporates the FAR's definition of a weakness as a "flaw in the proposal that increases the risk of unsuccessful contract performance." 48 C.F.R. § 15.001. (AR at 827.) The INS concedes that at least one of the inconsistencies was based on an agency computational error (Def.'s Suppl. Opp. Br. at 34) but contends that the existence of other inconsistencies supports the TEC's conclusion that the mistakes or omissions were "representative of [LABAT's] lack of understanding of the RFQ" (AR at 1561). Significantly, the SSAC did not view the weaknesses as being major. (AR at 6221.) Because plaintiff's likelihood of success is not contingent upon the reasonableness of the agency's assignment of these weaknesses to LABAT's proposal, the Court need not discuss them further.

Finally, the record reveals that the INS fulfilled its obligation under the RFQ (AR at 833) to conduct discussions in accordance with FAR procedures. FAR 15.306(d) requires contracting agencies to indicate to, or discuss with, any offeror remaining in the competitive range any significant weaknesses, deficiencies, and other aspects of its proposal that could be altered or explained to

---

1. LABAT correctly points out that the INS mailroom data was based not on individual pieces of mail but rather on individual "mail transactions," i.e., a single piece of mail can generate multiple mail transactions. However, this distinction does not change the nature of the deficiency.

enhance materially the proposal's potential for award. 48 C.F.R. § 15.306(d). Here, the INS informed LABAT on numerous occasions that it had problems with LABAT's estimating model. For example, during the discussions of September 27, 2000, the INS notified LABAT that its management estimates rationale was insufficient to validate the estimating model. (AR at 1198.) In an October 25 discussions letter, the INS informed LABAT that its model was flawed and did not properly calculate prices. (AR at 1604.) By engaging in these and other communications, the INS satisfied its obligation under the RFQ to engage in meaningful discussions with· LABAT about its proposal's weaknesses and deficiencies. To the extent that the INS discovered additional faults in LABAT's final proposal, it was under no obligation to reopen discussions post-award. *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 848 (1999) (holding that contracting agency had no obligation to discuss deficiencies first identified in Best and Final Offers).

LABAT's failure to demonstrate that it will ultimately prevail on this bid protest weighs heavily against granting the motion for a preliminary injunction. Although no single factor is determinative, "[a]bsent a showing that a movant is likely to succeed on the merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed. Cir.1993). The remaining preliminary injunction factors also weigh in favor of defendant and intervenor. Lost profits and a lost opportunity to compete constitute irreparable injury. *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388 (1999); *Essex Electro Eng'rs v. United States,* 3 Cl.Ct. 277, 287 (1983) *aff'd* 757 F.2d 247 (Fed.Cir.1985); *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001). However, based on the Court's preliminary review of the merits of LABAT's claims, the balance of financial and other harms tips in favor of defendant and intervenor. The status of the BPA award has been in flux for more than six months. The government has no contractual relationship with LABAT following the expiration of the con-

tract extension. In the absence of any strong reason to question the integrity of the procurement process, the public interest is served by allowing the government to proceed with contracts awarded in a manner consistent with fair and open competition, to the contractor offering the best value. *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 364, 370 (2001).

## CONCLUSION

For the reasons discussed above, the intervenor's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim, is **DENIED**. Plaintiff's motion for a preliminary injunction is also **DENIED**.

**IT IS SO ORDERED.**