GROUP SEVEN ASSOCIATES, LLC, Plaintiff,

v.

The UNITED STATES, Defendant,

and

CACI, Inc., Intervenor.

No. 05–867C.

United States Court of Federal Claims.

Filed: Sept. 23, 2005.

Reissued: Oct. 13, 2005.*

* This opinion was first filed on September 23, 2005, under seal. The parties made minor redactions, reflected here by asterisks throughout.

Timothy A. Sullivan, Fort Washington, PA, for plaintiff. Michael H. Payne, of counsel.

Gregory T. Jaeger, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, for defendant.

Richard J. Webber, Washington, D.C., for intervenor. Melissa D. Droller of counsel.

## OPINION

BRUGGINK, Judge.

This is a post-award bid protest involving the award of a Department of Defense contract for contract administration support services. A ward was made to CACI, Inc. Plaintiff, Group Seven Associates, asks the court to direct the contracting officer to rescind the award to CACI and to reopen negotiations. CACI was permitted to intervene. The parties have filed cross-motions pursuant to RCFC 56.1. The matter has been fully briefed and oral argument was heard September 20, 2005. For reasons set out below, we reject the request for relief.

## BACKGROUND

Both Group Seven and CACI were contractors with existing General Service Administration ("GSA") Federal Supply Schedule Contracts ("FSS") issued pursuant to Federal Acquisition Regulation ("FAR") Part 8.4. The solicitation for both companies' underlying GSA FSS contracts stated that "[t]he Government contemplates award of an Indefinite Delivery, Indefinite Quantity (IDIQ) Multiple Award Schedule contract resulting from this solicitation, allowing for Firm Fixed–Price or Labor Hour task orders." Administrative Record ("AR") 7. Such task order may be subject to competition among FSS contract holders. *See* 41 U.S.C. § 253j(b) (2005). Accordingly, when the Department of Defense, acting through Washington Headquarters Services ("WHS") later determined that it needed acquisition support services, it announced in a May 17 Request for Proposals ("RFP") that it would "award a single Firm Fixed–Price Task Order" for such services.

Prospective offerors were to submit their proposals by June 1, 2005. The solicitation set out the following three main evaluation factors, all of equal importance: (a) management approach, (b) past performance, and (c) price. Offerors were to meet all solicitation requirements and satisfy all evaluation factors to be eligible for the award. The first factor, management approach, contained four sub-factors, in the following order of importance: staffing plan, resource management, performance metrics, and transition plan. With respect to the fourth sub-factor, "transition plan," the RFP stated that each offeror was to "provide a plan for transitioning to full performance during the phase in period identified in the RFP. . . . The transition plan shall include milestones for critical activities such as recruiting, hiring, training, security clearance and any other special considerations." AR 333. The phase-in period was defined as July 5 through September 30, 2005.

In response to the solicitation, both CACI and Group Seven submitted proposals. Within CACI's proposal, the line item for pricing the transition period was split into

three options, depending on the level of work the agency opted to have performed:

a. Alternative 1 "prices" the * * * people who are CACI employees assigned to the WHS projects as of 1 July and holds that level throughout the three-month period. This alternative would be used if the Government intends to keep all four incumbent contractors in place throughout the transition period.

b. Alternative 2 "prices" the * * * people who are CACI employees in July and adds * * * on August 1. August and September prices reflect * * * people.

c. Alternative 3 is the same as Alternative 2 for July and August but differs by going to the full capacity on 1 September. The advantage of this option is that all people to support WHS at the start of the base period are on board and working together as a full team. The second advantage is that WHS can end the incumbent contracts earlier, which will reduce the administrative management workload.

AR 515. The transition period staffing option was the only contract line item as to which CACI offered options. By choosing option "a," the agency would have paid $17.4 million for the base year and four option years. By choosing different staffing levels during the transition period, costs would have gone up incrementally. All three options accounted for the entire three-month transition period.

Group Seven's proposal did not include any options within particular contract line items. It offered a single price, * * *.

In evaluating the proposals from CACI and Group Seven, WHS assigned the following ratings for the two substantive factors and four sub-factors. The rating system is included at the base of the chart: [1]

| FACTOR/SUBFACTOR | CACI | GROUP SEVEN |
|---|---|---|
| Management Approach: | | |
| –Staffing | * * * | * * * |
| –Resource Mgm't | * * * | * * * |
| –Performance Metrics | * * * | * * * |
| –Transition Plan | * * * | * * * |
| Past Performance: | * * * | * * * |

| Merit Ratings | Confidence Ratings |
|---|---|
| O = Outstanding | HC = High Confidence |
| E = Excellent | SC = Significant Confidence |

AR 665.

Based on CACI's higher merit and confidence rating for the two substantive factors, as well as its lower price, CACI was awarded the task order. The agency chose to go with the lowest priced alternative for the transition period, with a total resulting price of $17.4 million. Group Seven was notified on June 29, 2005, that it was not the successful offeror. In response, it requested a debriefing, which occurred on July 6, 2005. Group Seven filed a protest with the agency on July 11, 2005, challenging the award and evaluation process. The agency denied the protest on July 19, 2005. Group Seven filed its protest here on August 5, 2005.

## DISCUSSION

Plaintiff's sole remaining [2] basis for challenging the award to CACI is that its submission of alternate pricing proposals for the transition period was improper. Defendant's primary response is that our review is barred by 10 U.S.C. § 2304c(d) (2005) and 41 U.S.C. § 253j(d), which prohibit bid protests of task orders.[3] Alternatively, defendant and intervenor argue that consideration of CACI's alternate proposals was not improper because each pricing option complied with the terms of the solicitation.

*Subject Matter Jurisdiction*

The Tucker Act grants the court jurisdiction to entertain post-award bid protest actions "in connection with a procurement or proposed procurement." See 28 U.S.C. § 1491(b)(1) (2000). Review is pursuant to the standard of review set out in the Administrative Procedure Act.[4] § 1491(b)(4) ("In

---

1. The third factor—price—was not given a rating. CACI's price was lower than Group Seven's by over * * *.

2. In its complaint and briefing, plaintiff also argued that the agency's evaluation was improper, as it utilized criteria not included in the solicitation. At oral argument, however, it conceded that even if its ratings were increased in the

contested areas, CACI still would have been the best value to the agency.

3. Intervenor does not join in this argument.

4. Administrative Procedure Act of 1946, June 11, 1946, ch. 324, 60 Stat. 237 (codified as amended in scattered sections of 5 U.S.C.).

any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Accordingly, the court can hold unlawful and set aside agency action which is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000).

Defendant argues that 10 U.S.C. § 2304c(d) and 41 U.S.C. § 253j(d) divest the court of jurisdiction to hear this case. These statutory provisions are part of the Federal Acquisition Streamlining Act[5] ("FASA") and apply to orders under task and delivery order contracts. A "task order contract" is defined as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d(1); 41 U.S.C. § 253k.[6] A task order is defined as "an order for services placed against an established contract or with Government sources." FAR 2.101. Task orders may be issued for specific jobs, as needed. Task orders are not, however, with minor exceptions not relevant here, subject to court oversight: "Protests.—A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under the order issued." 10 U.S.C. § 2304c(d); *see also* 41 U.S.C. § 253j(d) (containing identical language).[7] A similar prohibition appears at FAR Part 16.5.

Plaintiff contends that these prohibitions on judicial review are not applicable here, on the grounds that neither the statutory provisions nor the regulation relate to task order contracts issuing out of FSS contracts. In

support, it cites to *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99 (2001). That case also involved a GSA FSS contract. There, the government announced that it planned to award a fixed-price blanket purchase agreement ("BPA") to a contractor already holding a FSS contract under GSA's Document Management Services and Supply Schedule. Although the FSS program allows for a less formal process, the government elected to use procedures more typical to a negotiated procurement. Ultimately, the BPA award was made to a contractor other than the incumbent. Labat challenged the award. The awardee intervened and argued that Labat's challenge was barred by 41 U.S.C § 253j(d). The court disagreed, primarily because the award involved a BPA, not a task order. The BPA, according to the court, "is not a task order itself, but rather a vehicle against which task orders will be placed." *Id.* at 105. Further, the court agreed with the holding in *In re Severn Cos., Inc.,* 97–1 Comp. Gen. ¶ 181, n. 1, 1997 WL 270342 (1997), which reasoned that the task order protest bar in § 253j(d) (which was enacted by FASA) was not intended to preclude protests with respect to the placement of BPAs against GSA FSS contracts. *Labat–Anderson,* 50 Fed.Cl. at 105.

While the GAO decision in *Severn* recites that it relied on the legislative history of FASA itself, the Court of Federal Claims concluded that FASA's legislative history "does not shed meaningful light on the scope of the task order protest bar." *Id.* It relied, instead, on the language of and regulatory comment to FAR Subpart 16.5, which covers Indefinite Delivery contracts and the procedures for orders placed against them. The court concluded that the regulation and adopting commentary suggest that GSA FSS

---

5. Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243 (codified in scattered sections of 10 U.S.C. and 41 U.S.C.). The act's IDIQ provisions are codified identically at 10 U.S.C. §§ 2304a–04d and at 41 U.S.C. §§ 253h-k.

6. Services can be commercial items as defined in FAR 2.101 ("[c]ommercial item means ... service of a type offered and sold competitively in substantial quantities in the marketplace based on established catalog or market prices for spe-

cific tasks performed or specific outcomes to be achieved.").

7. Instead, such complaints are to be reviewed by a task order ombudsman responsible for ensuring that "all contractors [under a multiple task order contract] are afforded a fair opportunity to be considered for task ... orders when required under subsection (b)." *See* 10 U.S.C. § 2304c(e); 41 U.S.C. § 253j(e).

32

contracts are governed by a separate regulatory scheme apart from ordinary Indefinite Delivery contracts. It concluded that, although a GSA FSS contract might be of the Indefinite delivery type, as is the case here, it is governed by FAR Part 8, the provision dealing with GSA FSS contracts, rather than by FAR Subpart 16.5. FAR Part 8 does not contain similar restrictive language. The court then concluded that, because FAR Subpart 16.5 does not apply to FSS contracts, neither should the statutory bar.

The first element of the *Labat–Anderson* analysis-the use of a BPA rather than a task order-is not present here. It is clear that the May 17 solicitation was for a task order. The language incorporated into both original FSS contracts states that they were to serve as a vehicle against which task orders could be placed. Accordingly, the May 17 solicitation later indicated that "the Government will award a single Firm Fixed–Price task order." AR 329. Unlike the BPA in *Labat–Anderson*, there is no reference in the RFP to the possibility of the issuance of further task orders pursuant to that solicitation. Therefore, the first rationale of *Labat–Anderson*, that the order is merely a vehicle against which further task orders can be placed, is inapplicable.

The second rationale of *Labat–Anderson*-that FASA does not apply to GSA FSS contracts-is more problematic. While we can follow the analysis of *Labat–Anderson*, we find it less than compelling. The statutory language, moreover, does not suggest any exceptions. In short, jurisdiction, is doubtful. Nevertheless, given the *Labat–Anderson* decision and the intervenor's reluctance to rely on it, we will assume that jurisdiction attaches and go on to the merits of the case.

*Permissibility of Alternate Proposals*

Plaintiff offers two related challenges to the award to CACI. The first is that CACI offered non-conforming and impermissible "alternate" proposals. Even if the proposal accepted by WHS is conforming, however, Group Seven contends that the receipt of more than one conforming offer was improper. Plaintiff correctly points out that the solicitation did not notify offerors that multiple proposals were allowed. Rather the solicitation contained the following language which plaintiff finds significant: "[T]he offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint." AR 340. From this, plaintiff contends, offerors should have assumed that they could submit only one offer, even if others might have been conforming.

■ We can deal with the latter argument first. Multiple bids that are consistent with the solicitation's terms are acceptable. *Educational Media*, 87–2 Comp. Gen. ¶ 442 (1987) ("the government may accept an alternate offer that meets the requirements of the solicitation even though the solicitation does not provide for alternate proposals.").[8] Nor do we view the language of the solicitation ("best terms from a cost or price ... standpoint") significant. We view that language as a warning that bidders should not assume they can offer different prices at a later point. In any event, CACI's submission did contain its best price.

The balance of plaintiff's argument is that CACI impermissibly offered non-conforming alternates. This court in *Essex Electro Engineers, Inc. v. United States*, explained the significance of such offers:

> In the rubric of procurement, an alternate bid is one which offers to supply something other than what an [invitation for bids] requires as an alternative method of meet-

**8.** For this reason, plaintiff's reliance on FAR 12.301(b)(1), which applies to the acquisition of "commercial items," is misplaced. This provision requires inclusion of standard clause FAR 52.212–1. While FAR 52.212–1 was incorporated into each company's GSA FSS contract, the provision was "tailored" to delete sub-section(e): "*Multiple Offers.* Offerors are encouraged to submit multiple offers presenting alternative terms and conditions or commercial items for

satisfying the requirements of this solicitation. Each offer submitted will be evaluated separately." Plaintiff concludes that the omission of subparagraph (e) means that multiple offers are prohibited. We disagree. Even assuming that this language deals only with conforming offers, its omission only means that the agency was not *encouraging* multiple offers. It does not preclude them.

ing the Government's needs. Such bids are non-responsive. On the other hand, a bid might offer several alternative responsive items at different prices, the lowest of which can properly be considered.

3 Cl.Ct. 277, 282 n. 6 (1983). The question, then, is whether CACI offered a prohibited, i.e., nonconforming, proposal. We conclude that it did not.

■ The price proposal form within the solicitation contained spaces allowing the bidder to offer prices for the start-up transition period and for each of the subsequent years. Rather than state one price for the transition period, CACI's price proposal contained prices for each of three variations of a transition period plan. The variations turned on the number of staff that would be engaged. The more expensive variations bulked up the transition staff, thereby making full performance possible at an earlier date. The three prices, however, were for the net cost throughout the three months transition period. Any one of those variations conformed to the solicitation's transition period requirement.[9] Indeed, plaintiff does not contend that "option a," if submitted as the only option, would be inconsistent with any aspect of the solicitation, which only required that each proposal contain "a plan for transitioning to full performance *during* the phase-in period," July 5 through September 30. (Emphasis supplied.)

The solicitation listed the dates of the transition phase-in as July 5, 2005, through September 30, 2005, but gave no indication that the offeror could not transition to full performance before September 30. It was within the discretion of each offeror to set a date by which their team would transition to full performance. Each of CACI's multiple proposals did that and thus were responsive. GSA was at liberty to choose any of the three.

■ *Alfa Laval Separation Inc. v. United States*, 175 F.3d 1365 (Fed.Cir.1999), on which plaintiff relies, is not to the contrary. In that case a proposal did not conform to the solicitation's testing requirements. The lower court reasoned that a great disparity in price made up for the technical deficiencies of the proposal. *Id.* at 1368. The court of appeals disagreed, stating that no matter how great a price differential, acceptance of a nonconforming bid prejudices other offerors. *Id.*[10] We have concluded, however, that CACI's proposal is not non-conforming.

In sum, multiple, conforming offers were not prohibited. Although acceptance by WHS of a non-conforming offer would be prohibited, that did not occur here.

## CONCLUSION

For the reasons set out above, plaintiff's motion is denied and defendant's is granted. The Clerk is directed to dismiss the complaint. No costs.

---

9. Even if the second and third alternatives were nonconforming because they permitted the incumbent to be released earlier, as plaintiff contends, the agency accepted the plainly conforming offer. While non-conforming bids cannot be accepted, it is not improper, if a bidder offers a set of alternatives in which some options are conforming and some are not, the conforming offer does not have to be rejected. Rather, the agency may consider those alternatives that conform to the solicitation's material terms. *Saxon Export*, 93–2 Comp. Gen. ¶ 130, 1993 WL 342242 (1993).

10. As to the other cases on which plaintiff relies, each address a proposal that did not conform to the solicitation in some way. In *Advanced Designs Corp.*, 98–1 CPD 100, 1997 WL 862967 (1997), for example, the agency properly rejected a proposal as nonconforming where the proposal contained several do-it-yourself options for the agency to choose from, took several exceptions to the solicitation, and did not provide firm, fixed prices for each option. Similarly, in *Dubinsky v. United States*, 44 Fed.Cl. 509 (1999), the court denied a bid protest where the proposal did not conform to the terms of the solicitation. There, the proposal offered a warranty that did not meet solicitation requirements and did not assure that lettering for a scoreboard would conform to the solicitation.